UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
CYNTHIA ROMAN,                           :     15 Civ. 4800 (LGS) (JCF)
                                         :
               Plaintiff,                :        REPORT AND
                                         :     RECOMMENDATION
    - against -                          :
                                         :
CAROLYN W. COLVIN, Acting                :
Commissioner of Social Security,         :
                                         :
               Defendant.                :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE LORNA G. SCHOFIELD, U.S.D.J.:

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _8/2/16_

    The plaintiff, Cynthia Roman, brings this action pursuant

to section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), appealing a decision by the Commissioner of

Social Security (the "Commissioner") finding that she is not

entitled to Supplemental Security Income ("SSI") benefits.  The

parties have submitted cross-motions for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  For the reasons that follow, I recommend denying the

plaintiff's motion and granting the Commissioner's motion.

Background

    A.   Personal History

    Ms. Roman, born on August 5, 1975, filed an application for

SSI on August 30, 2012, when she was 37 years old.  (R. at 21,

52).[1]  She earned a GED and completed child care training and worked as a child care provider and a counselor at a juvenile home.  (R. at 160-61).  The plaintiff stopped working in October 2010 due to her medical impairments.[2]  (R. at 160).

B.  Medical History

1.  Records Prior to the Plaintiff's SSI Application

Ms. Roman saw Dr. Dawn McAllister at Hudson River HealthCare Inc. starting in February 2010, at which time she complained primarily of joint pain in her hands, knees, and elbows that began after she was bitten by a tick, as well as migraines and asthma.  (R. at 296).  She was taking several asthma medicines and Imitrex for headaches.  (R. at 296).  On April 20, 2010, the plaintiff saw Dr. McAllister because of asthma and shortness of breath that prevented her from sleeping.  (R. at 293).  She also reported having headaches and seizures about once every three weeks for the past year, which the doctor

---

[1] Citations to "R." refer to the Administrative Record that the Commissioner filed with the Court as part of her answer to the complaint.

[2] Even though Ms. Roman alleged a disability onset date in October 2010 (R. at 160), SSI benefits "can only be granted prospectively"; therefore the only issue to be decided is whether Ms. Roman was disabled under the Act as of the date of her application.  Dehnert v. Astrue, No. 07 CV 897, 2009 WL 2762168, at *4 (N.D.N.Y Aug. 24, 2009) (collecting cases); see also 20 C.F.R. § 416.335.  However, the ALJ is required to develop a "complete medical history," which includes at least the twelve months preceding the filing of an application.  Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (quoting 42 U.S.C. § 423(d)(5)(B)).

diagnosed as epilepsy. (R. at 293). Dr. McAllister prescribed Keppra for epilepsy, tested for Lyme disease, and diagnosed Ms. Roman with GERD,[3] for which she prescribed Omeprazole. (R. at 294). In a follow up appointment on May 4, 2010, the plaintiff reported having significant pain in her legs and hands. (R. at 288). Dr. McAllister started Ms. Roman on doxycycline for Lyme disease. (R. at 288). The plaintiff saw Dr. McAllister on May 25, 2010, because she tested positive for diabetes and also because her asthma was not under control. (R. at 285). At this time, she was prescribed Verapamil for her migraines. (R. at 285). At her next follow-up appointment in June 2010, Ms. Roman said that she was improving and that her main symptoms were from asthma and allergies, for which she was prescribed Loratadine. (R. at 283). The plaintiff also saw Dr. McAllister in September 2010 for a follow-up and reported pelvic and stomach pain. (R. at 280-81). Dr. McAllister suggested that the stomach pain could be a side effect from Omeprazole, switched Ms. Roman to Nexium, and referred her to a gastroenterologist. (R. at 281).

In October 2010, the plaintiff was diagnosed with, and began treatment for, hyperthyroidism and was asked to follow up

---

[3] Gastroesophageal reflux disease (GERD) results from "a muscle at the end of your esophagus [that] does not close properly. This allows stomach contents to leak back, or reflux, into the esophagus and irritate it." U.S. National Library of Medicine, GERD, Medline Plus, https://www.nlm.nih.gov/medlineplus/gerd.html (last visited June 30, 2016).

with Dr. McAllister in four weeks. (R. at 277-78). Ms. Roman gave birth to a baby in June 2011 and next saw Dr. McAllister on January 6, 2012 because of "severely persistent" asthma and a new rash.[4] (R. at 272). She reported having severe asthma, trouble bending down, back pain, migraines about once a month that were adequately treated with Imitrex, and two seizures during her pregnancy, but none since. (R. at 272). On April 7, 2012, Dr. McAllister referred Ms. Roman to a podiatrist, a Dr. Abraham, for pain in both of her feet -- which she noted could be due to Lyme disease -- and recommended stretching. (R. at 268-69). At this appointment, the plaintiff denied having any seizures and did not report any headaches. (R. at 268). On May 1, 2012, the plaintiff saw Dr. Brandon Yee for an MRI of her left foot, which showed a chronic tibiofibular lateral collateral ligament tear, small tibiofibular joint effusion,[5] boney encroachment on the second interspace, mild tailor's

---

[4] There are no medical records from Dr. McAllister between October 4, 2010 and January 6, 2012.

[5] Effusion is the "accumulation of intra-articular fluid." Alexandra Villa-Forte, Pain in and Around a Single Joint, Merk Manual (Professional Version) https://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/pain-in-and-around-joints/pain-in-and-around-a-single-joint (last visited June 20, 2016).

bunion, mild hallux valgus,[6] and small first and second metatarsophalangeal joint effusions.  (R. at 360-61).

    2.  <u>Records Subsequent to SSI Application</u>

Dr. McAllister saw the plaintiff on September 7, 2012, for a follow-up appointment. (R. at 265).  Ms. Roman reported pain in both of her legs, her left arm, and all of her fingers for the past two months and noted that she had a partial seizure the month before.  (R. at 265).  The doctor diagnosed the plaintiff with osteoarthritis, for which she prescribed acetaminophen as needed.  (R. at 266).  The doctor also reviewed benefits of a healthy life style and recommended, among other practices, 150 minutes of exercise each week, in response to which the plaintiff said she was motivated to improve her fitness.  (R. at 265).  At her next appointment on October 19, 2012, the plaintiff reported having blacked out after two days of severe migraines, and Dr. McAllister switched her migraine medicine from Verapamil to NIFEdipine.  (R. at 263).  Dr. McAllister again encouraged exercising 150 minutes a week, and the plaintiff responded that she was motivated to do so.  (R. at

---

[6] Hallux valgus, also known as a Bunion, is "a medial deviation of the first metatarsal and lateral deviation and/or rotation of the hallux, with or without medial soft-tissue enlargement of the first metatarsal head." Crista J. Frank et al., Hallux Valgus, Medscape, <u>http://emedicine.medscape.com/article/1232902-overview</u> (updated Nov. 5, 2014).

262).    On both October 19 and November 5, 2012, Ms. Roman reported having wheals[7] that were not adequately controlled by steroid creams.    (R. at 262, 259).    On both these dates the plaintiff again affirmed that she was motivated to improve her fitness.    (R. at 262, 259).    At the November 5 appointment, Dr. McAllister took the plaintiff off Loratadine and prescribed Cetirizine for thirty days to try and get the skin condition under control. (R. at 260).

On November 13, 2012, Ms. Roman saw Dr. William Lathan after a referral by the Division of Disability Determination. (R. at 350).    The plaintiff reported a seizure six days prior and headaches that were relieved by prescription medication. (R. at 350).    Ms. Roman told Dr. Lathan that she could perform all of her daily activities; she did not need help changing or getting on the exam table.    (R. at 351).    Dr. Lathan recorded the plaintiff's history of seizures, headaches, back syndrome, low back pain aggravated by bending and heavy lifting, hypertension, and asthma.    (R. at 350).    Dr. Lathan recorded that she was not in acute distress, her gait was normal, she could walk on her heels and toes without difficulty, and she could squat fully.  (R. at 351).    Dr. Lathan found that she had

---

[7] A wheal is a "raised, itchy [] area of skin that is sometimes an overt sign of an allergy and is sometimes called a welt and often a hive." Definition of Wheal, MedicineNet.com, http://www.medicinenet.com/script/main/art.asp?articlekey=9539. (last edited May 13, 2016).

full movement in her cervical and lumbar spine, and "[n]o scoliosis or kyphosis or abnormality in the thoracic spine," as well as a full range of motion in her shoulders, arms, wrists, hips, knees, and ankles. (R. at 352). An x-ray of her lumbar spine was within the normal limits. (R. at 352). Dr. Lathan found that there were "[n]o evident subluxations, contractures, ankyloses[,] or thickening" and that her "[j]oints [were] stable and nontender" without any "redness, heat, swelling[,] or effusion." (R. at 352). He described her prognosis as "stable" and recommended that she "avoid driving, ascending heights and working near heavy machinery, smoke, dust and noxious fumes." (R. at 352).

Ms. Roman saw Dr. Lin Steven on November 19, 2012, at Westchester Neurological Consultants for treatment of her migraines. (R. at 460). She complained that her headaches had increased from three or four times a month to nearly every day and stated that that Imitrex helped with her headaches but made her drowsy so she would only take it if her headache was severe. (R. at 460). Dr. Steven ordered an MRI of her brain, and because the worsening headaches could be due to fluctuating blood pressure, he prescribed a management plan to optimize her blood pressure. (R. at 461). The plaintiff denied having any back, neck shoulder, hip, arm, or leg pain, and Dr. Steven's examination showed the plaintiff's motor system, sensory system,

reflexes, and movements to be normal.  (R. at 461).  Dr. Steven also prescribed a short course of steroids, which the plaintiff later reported afforded her temporary relief.  (R. at 461, 455).  On November 28, 2012, an MRI of the plaintiff's brain at St. John's Riverside Hospital ("St. John's") revealed "[n]o gross evidence of a focal intracranial lesion or hemorrhage."  (R. at 457).

On November 29, 2012 the plaintiff visited St. John's complaining of a rash and was diagnosed with scabies. She denied any other complaints after being questioned. (R. at 407, 409).

In a follow-up appointment at Westchester Neurological Consultants, Ms. Roman complained of a severe increase in the frequency of her headaches, for which she took Imitrex, and also pain in her neck that radiated to her left shoulder and her hands.  (R. at 455).  An x-ray of her left shoulder taken on January 16, 2013 revealed "[n]o gross bone or soft tissue abnormality, . . . fracture, or dislocation." (R. at 406).

On February 6, 2013, the plaintiff went to St. John's complaining of abdominal pain and was diagnosed with an acute urinary tract infection, uterine leiomyoma, and kidney stones. (R. at 387-90).  She also reported pain on the left side of her neck.  (R. at 388).

On February 8, 2013, the plaintiff saw Dr. McAllister for a physical and stated that she was in no pain, that her migraines

had improved and that her asthma was controlled. (R. at 366-67). At a follow-up on February 15, 2013, the plaintiff complained of pain in the lower right side of her back, which since that morning that was a ten out of ten on the pain scale. (R. at 364). Even so, Dr. McAllister noted that Ms. Roman was "well appearing" and in "no acute distress." (R. at 364). The doctor again encouraged the plaintiff to practice a healthy life style, including exercising at least 150 minutes each week. (R. at 364).

The plaintiff saw Dr. Steven on February 25, 2013, for a follow-up, complaining of headaches and neck pain shooting down her left arm. (R. at 453). She also was suffering from fluctuating blood pressure and was having seizures about three times a month. (R. at 453). The doctor noted that Ms. Roman had cervical radiculopathy. (R. at 454). He recommended that she go to physical therapy, wear a soft cervical collar at night, increase Keppra (for seizures), and better manage her blood pressure. (R. at 454).

An MRI of the plaintiff's cervical spine on March 9, 2013, showed a small central/left disc herniation on C5-C6 with compression of the left C6 nerve root. (R. at 383). During a follow-up on April 8, 2013, the plaintiff complained of neck and back pain, though Dr. Steven noted that she had not complained of back pain before this date. (R. at 447). She reported her

pain as an eight or nine out of ten and stated that she had not
yet seen a physical therapist. Her seizures continued to occur
three to four times a month, always during the night and usually
around four a.m. (R. at 447). She had been unable to take
gabapentin for her seizures because of gastrointestinal issues.
(R. at 447).

On April 15, 2013, the plaintiff saw a Dr. Lee at
Westchester Neurological Consultants, and complained of chronic
neck pain since November 2012, which she described as "sharp"
pain that radiated down her left shoulder though her left
forearm, as well as paresthesia (tinging) in her fingers. (R. at
444). She also said that her pain was related to her headaches,
that it was constant and worse when she was standing or sitting,
and that it was ten out of ten.   (R. at 444).   Dr. Lee
attributed the pain to a displaced disc at C5-C6 and cervical
radiculopathy and recommended a series of cervical epidural
steroid injections. (R. at 445).

On May 2 and 16, 2013, the plaintiff received steroid
injections that she subsequently reported gave her eighty
percent relief. (R. at 435). Dr. Lee recommended that she follow
up when necessary based on her pain level, continue stretching
exercises for low back pain, and follow-up with her neurologist
for her seizure disorders. (R. at 436).

After being assaulted by a neighbor with a broomstick on July 30, 2013, the plaintiff was admitted to St. John's with complaints of an injured wrist and a bruised left ribcage. (R. at 372). She was discharged with a sprained wrist and directions to apply ice, rest, elevate her arm, and use an ACE wrap. (R. at 375).

At an appointment with Dr. Lee on August 19, 2013, Ms. Roman reported that she had developed pain in her right shoulder (previously only her left shoulder had been symptomatic) and low back pain that radiated down her right groin and anterior thigh. (R. at 430). She described her pain as ten out of ten and reported that she took Ibuprofen as needed. (R. at 430). The doctor noted that she was awake, alert, oriented, and showed no distress. (R. at 430). Her cervical spine had mild spasms but full range of motion. (R. at 430). She denied any neck pain or headaches and reported that she had been doing well until a month earlier when her right shoulder pain and low back pain had developed. (R. at 430). She received a right shoulder steroid injection and reported near complete relief immediately. (R. at 432). Dr. Lee referred her to get an MRI of her right shoulder and lumbar spine and an EMG of her arm. (R. at 432).

On September 6, 2013, an electro diagnostic study of the plaintiff's lower extremities showed evidence of mild acute and

chronic L3/L4 radiculopathy on the right, though all nerve conduction studies were within normal limits. (R. at 428, 463).

Ms. Roman had a follow-up appointment with Dr. McAllister on November 11, 2013, where she was assessed to suffer from hyperthyroidism, intermittent asthma, migraines, arthralgia (joint pain), epilepsy, Lyme disease, dyspepsia (indigestion), nevus of head (moles), and nephrolithiasis (kidney stones). (R. at 470).

### C. Procedural History

Ms. Roman filed her SSI application on August 30, 2012. (R. at 148). The Social Security Administration denied the application on November 30, 2012 (R. at 64-67), and the plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 73-74). She appeared with counsel at a hearing before ALJ Dennis G. Katz on October 15, 2013. (R. at 36).

At the hearing, Ms. Roman testified that she had stopped working as a counselor at a juvenile home because her seizures had gotten worse and she could not get out of her bed due to tiredness, back pain, leg pain, and neck pain. (R. at 38). The plaintiff told the ALJ that despite taking medication for her seizures, she still had two to three each month, after which it took her one to two hours to recover. (R. at 39-40). The seizure medication also caused her to be fatigued. (R. at 40).

The plaintiff further testified that she had been suffering from neck and back pain for two or three years, which had caused her to lose feeling in her arms and be unable to carry her two year old daughter. (R. at 40-41). She reported that sitting for extended periods caused her neck pain and that her doctor had given her a cervical collar to wear at night. (R. at 42). The plaintiff did not take any medication for her neck, but she was taking gabapentin for nerve damage. (R. at 42-43). She also said that she could not turn her neck to the right, left, or down, and she could only look up to a limited extent. (R. at 49).

Ms. Roman reported that she suffered from extreme migraines caused by neck pain, back pain, light, and noise. (R. at 38, 44-45). She often had migraines every day for a week and could not do anything because of the pain. (R. at 44).

Ms. Roman also testified that she could not walk for more than a block without falling or tripping because of chronic torn ligaments in her left foot. (R. at 43-44). According to the plaintiff, doctors thought the tear may have been there for years and had progressively gotten worse, and they had discussed surgery to repair it. (R. at 46). She said that she could only sit for five minutes before she had to get up, and during the day she tried to alternate between lying down and sitting, but was unable to stand up. (R. at 45). The plaintiff testified

that each night she only slept twenty to thirty minutes in total because of pain in her legs or back.  (R. at 45).

The plaintiff reported that she was unable to take care of her daily personal activities and needed help from her twenty year old daughter.  (R. at 47).  She was often unable to open a gallon of milk, button a shirt, or use zippers because her hands cramped.  R. at 47).  She could not reach over her head or reach straight out in front because a previous operation on her right shoulder had limited her mobility.  (R. at 47).  Ms. Roman also testified that she was unable to bend over to pick something up from the floor, clean the house, or drive.  (R. at 47-48).  She sometimes needed help from her older daughter to get dressed and bathe, and her daughter brought her to her doctors' appointments, which was usually the only time she left the apartment.  (R. at 48).  The plaintiff did not generally do the grocery shopping; when she did, she went with her daughter, became exhausted from walking down the aisle, and could not carry anything heavy.  (R. at 49).

On January 6, 2014, the ALJ issued a decision finding that the plaintiff was not disabled within the meaning of the Social Security Act during the period beginning August 30, 2012.  (R. at 18-29).

Analytical Framework

    A. Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to SSI if she can demonstrate through medical evidence that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015). The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is entitled to disability benefits, the Commissioner follows a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). First, the claimant must demonstrate that she is not currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4), (b). Second, the claimant must prove that she has an impairment severe enough to significantly limit her physical or mental ability to perform basic work. 20 C.F.R. § 416.920(a)(4)(ii), (c). Third, if the

impairment is listed in Appendix 1 of the regulations ("the Listings"), 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d). Fourth, if the claimant is unable to make the requisite showing under step three, she must prove that she does not have the residual functional capacity to perform her past work. 20 C.F.R. § 416.920(a)(4)(iv), (e). Fifth, if the claimant establishes that she is unable to return to her former employment, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. § 416.920(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)). In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

B. Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A reviewing court "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence."  Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008).  Second, the court must decide whether the ALJ's decision was supported by substantial evidence.  Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8.  "In determining

whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d at 62, and Williams ex rel. Williams v. Bowen, 859 F.2d 255, 256 (2d Cir. 1988)).  Substantial evidence in this context is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Analysis

    A.  The ALJ's Decision

ALJ Katz analyzed the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that she was not disabled on or after the date she filed for benefits. (R. at 23).  He first determined that Ms. Roman had not engaged in substantial gainful activity since the date she filed her application. (R. at 23).  Next, at step two, he found that Ms. Roman had severe impairments -- specifically Lyme disease, epilepsy, migraines, osteoarthritis, cervical and lumbar radiculopathy, deep vein thrombosis of the lower extremity, a left foot impairment, asthma, and obesity -- that more than

minimally affected her ability to perform basic work activities.
(R. at 23).

At step three, ALJ Katz found that none of the plaintiff's
impairments, alone or in combination, met or medically equaled
the severity of one of the impairments identified in the
Listings.  (R. at 23).  More specifically, he found that Ms.
Roman's impairments did not meet the criteria under any of the
applicable sections of (1) Musculoskeletal System (listing
1.00), (2) Respiratory System (listing 3.00), or (3) Immune
System Disorders (listing 14.00).  (R. at 24).  In addition, ALJ
Katz considered obesity both alone and in combination with the
plaintiff's other impairments.  (R. at 24).  He found no medical
evidence or medical opinion in the record that the plaintiff had
any "impairment, singly or in combination, [that] medically
equaled the criteria of any listed impairment".  (R. at 24).

At step four, ALJ Katz found that Ms. Roman had the
residual functional capacity "to perform medium work as defined
in 20 CFR 416.967(c)."  (R. at 24).  He concluded that the
plaintiff was "able to frequently lift and/or carry objects
weighing 30 pounds and occasionally lift and/or carry objects
weighing 50 pounds." (R. at 24).  He also held that she was able
to sit for 8 hours, and stand and or walk for six hours in an
eight-hour workday.  (R. at 24).

ALJ Katz also addressed the plaintiff's non-exertional limitations by stating that she should "avoid driving, ascending heights, working near heavy machinery[,] and working in places where there are noxious fumes." (R. at 24). Finally, ALJ Katz found that while the plaintiff suffered from an asthmatic condition, it was not acute and was adequately controlled by medication. (R. at 27). The ALJ addressed her asthma by recommending that the plaintiff not work around toxic materials, a limitation adopted from Dr. Lathan's assessment. (R. at 27).

ALJ Katz held that Ms. Roman had the residual functional capacity to meet the requirements of her previous position as a child care worker since this job only required her to perform at a light exertional level. (R. at 27). He also found that there were a significant number of other jobs in the national economy that she could perform based on her age, education, work experience, and residual functional capacity. (R. at 28). ALJ Katz concluded that, due to her ability to perform both her previous work and a substantial number of jobs in the national economy, the plaintiff was not disabled. (R. at 27-28).

B.   Duty to Develop the Record

ALJ Katz fulfilled his duty to develop the record.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."   Perez v.

Chater, 77 F.3d 41, 47 (2d Cir. 1996).  This obligation requires the ALJ to "make 'every reasonable effort' to help an applicant get medical reports from her medical sources" and to collect any other evidence necessary to resolve "inconsistencies, gaps or ambiguities in the record."  Villarreal v. Colvin, No. 13 Civ. 6253, 2015 WL 6759503, at *17 (S.D.N.Y. Nov. 5, 2015) (quoting 20 C.F.R. § 416.913(e)).  The record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity.  20 C.F.R. § 416.913(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

When the claimant is represented by counsel, the ALJ is still required to develop the record.  Perez, 77 F.3d at 47.  However, he need not gather additional information "to fill any gap in the medical evidence," but rather must do so "only when the facts of the particular case suggest that further development is necessary to evaluate the claimant's condition fairly." Francisco v. Commissioner of Social Security, No. 13 Civ. 1486, 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2015). If a case had "a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ . . . it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity." Tankisi v.

Commissioner of Social Security, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order).

A developed record is one "complete and detailed enough" to allow the ALJ to determine the claimant's residual functional capacity. 20 C.F.R. § 404.1513(e). Here the ALJ fulfilled his responsibility to ensure the plaintiff had the records from her medical sources, including those covering the twelve months before she filed for disability. See 20 C.F.R. § 416.912(d). If the record is inadequate, the ALJ must request the missing information from the plaintiff's treating physician or from a consulting physician. Casino-Ortiz v. Astrue, No. 06 Civ. 155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007). Here, Ms. Roman received a residual functional capacity evaluation from a consulting physician, Dr. Lathan. (R. at 350-53). Dr. Lathan's opinion was based on a physical examination of the plaintiff, her x-rays, her medical history, and her own reports of her limitations of daily activities. (R. at 350-52). Furthermore, Dr. Lathan's opinion supports ALJ Katz's residual functional capacity assessment, except for where the ALJ gave some weight to Ms. Roman's subjective complaints about her foot impairment. (See R. at 25-26, 350-52). Even so, the ALJ's determination largely matches the consulting physician's opinion. (R. at 352, 26). In light of the extensive and apparently complete medical record and the consulting physician's residual functional

capacity opinion, the ALJ had no obligation to obtain a further medical opinion from one of the plaintiff's treating physicians.   Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013); see also Rosa, 168 F.3d at 79 n.5.

At the hearing, the plaintiff's counsel represented that the medical record -- which includes records from two treating physicians, a consulting physician, and numerous medical tests -- was complete, and the ALJ was satisfied that the reports from the plaintiff's frequent visits to her physicians presented a complete assessment of her medical condition.  (R. at 36).

The plaintiff argues that ALJ Katz failed in his duty to develop the record because he made his decision without a residual functional capacity assessment from a treating physician, relied on his own lay opinion, and made findings inconsistent with the medical evidence on record.  (Pl. Memo. at 11-15).  All of these contentions are contradicted by the ALJ's thorough explanation of his decision.  ALJ Katz described the steps he took when considering each of the physicians' opinions and the medical records and explained how the record supported his conclusion.  (R. at 24-27).  Furthermore, the ALJ's decision is in line with the weight of the medical evidence and is only contradicted by the plaintiff's testimony, which the ALJ determined to not be fully credible.  (R. at 26).

The ALJ's decision to reduce slightly Ms. Roman's residual functional capacity from what Dr. Lathan assessed was based on a thorough review of the medical record and the plaintiff's own testimony. (R. at 23-27). Thus the plaintiff's conclusion that her "true exertional capabilities are unknown at this point" and that the ALJ made his decision "based on his own lay opinion." (Pl. Memo. at 15), is unwarranted. The plaintiff's position is that remand is required to obtain a further medical opinion from a treating physician that elaborates on the plaintiff's exertional capabilities. (Pl. Memo. at 15). However, an ALJ is "entitled to weigh all of the evidence available to make a residual functional capacity finding that was consistent with the record as a whole," and his opinion does not need to "perfectly correspond with any of the opinions of medical sources cited in his decision." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013). In his decision, ALJ Katz properly considered all of the evidence on record, including a consulting physician's assessment of the plaintiff's residual functional capacity and the treating physicians' diagnoses and treatment.

The plaintiff cites La Torre v. Colvin No. 14 Civ. 3615, 2015 WL 321881 (S.D.N.Y. Jan. 26, 2015), for the proposition that the consulting physician's assessment was too vague to be relied on by the ALJ. (Pl. Memo. at 12-13). In La Torre the consulting physician reported that the plaintiff had "a moderate

restriction for stooping, squatting and strenuous exertion," and the court held that if an ALJ relies on a physician's opinion in determining residual functional capacity, that opinion must be sufficiently detailed.  La Torre, 2015 WL 321881, at *9.  The court's holding in La Torre, however, is not dispositive here, where the consulting physician clearly did not find any exertional limitations whatsoever, and therefore could not have provided more detail.

The plaintiff's assertion that the ALJ improperly relied on the absence of supporting medical evidence fails because this case was decided at step four of the sequential analysis where the plaintiff had the burden of proof.  The Commissioner "is entitled to rely not only on what the [medical] record says, but also on what it does not say."  Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983); accord Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) ("[I]t was proper for the ALJ to rely on the absence of findings by any physician concerning plaintiff's alleged inability to sit for prolonged periods in deciding that she could resume her work.")  The plaintiff here failed to meet her burden since there is no medical evidence that she is disabled to the point that she is unable to resume her previous employment.  Cf. Dumas, 712 F.2d at 1550.  The ALJ properly relied on the absence of evidence, including the absence of hospitalizations and emergency room visits for pain, seizures,

headaches, or asthma; the absence of surgery; the plaintiff's
accounts to her physicians that her pain was managed by
treatment; and her report to Dr. Lathan that she could perform
all of her personal daily activities. (R. at 27).

ALJ Katz noted that the MRIs taken in March 2013 showed
evidence of only mild cervical radiculopathy (R. at 454), and
the MRI from September 2013 showed evidence of mild lumbar
radiculopathy (R. at 428). Ms. Roman's treating physicians
recommended only conservative treatment for her pain, and she
had never been hospitalized for any of her alleged
impairments. See Casino-Ortiz, 2007 WL 2745704, at *10 (finding
that absence of hospitalizations supported ALJ's finding of no
disability). No physician ever recommended surgery for her back
or suggested that she should refrain from certain activities.
(R. at 46). The plaintiff received epidural injections that
provided her with eighty percent relief from her neck and
shoulder pain, and in August 2013 she told Dr. Lee that she only
took over-the-counter medicine as needed for pain in her right
shoulder. (R. at 430). While Ms. Roman reported intense pain
in her right shoulder and low back, she also appeared to be in
no distress and denied any neck pain. (R. at 430). Dr. Lathan
reviewed an x-ray of the plaintiff's spine and reported that it
was within the normal limits and a physical examination revealed
"no limitations in her physical movements." (R. at 351-52). He

did not recommend any exertional limitations, indicating that his examination of Ms. Roman did not support her account of debilitating back pain. (R. at 352). Indeed, the plaintiff told Dr. Lathan that she was able to "perform all activities of personal care and daily living." (R. at 350). Based on the success of the conservative treatment prescribed, the plaintiff's failure to report any physical limitations to her doctors, and the fact that no medical source mentioned any physical limitation, the ALJ correctly held that the record was fully developed and provided substantial evidence to find that Ms. Roman was not disabled.

Social Security Ruling 96-8p provides that in order to determine a claimant's residual functional capacity, an ALJ "must first identify the individual's functional limitations or restrictions and assess [] her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). However, in Cichocki v. Astrue, 729 F.3d 172 (2d Cir. 2013), the Second Circuit held that the lack of a function-by-function analysis does not automatically require remand, but rather "[t]he relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence. Id. at 177. If an ALJ fails to decide a

claimant's ability to perform certain functions when the record provides contradictory evidence, remand may be required.  Id. at 177.  On the other hand, if an ALJ's analysis "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous," remand is not mandatory.  Id.  While ALJ Katz did not go through a function-by-function analysis when he assessed Ms. Roman's residual functional capacity, his determination was based on substantial evidence and the proper legal standards.

The ALJ considered the medical record as a whole, noted that no physician ever limited the plaintiff to sedentary activities, and found that Ms. Roman had the residual functional capacity to perform the essential requirements of medium work. (R. at 24).  Based on the evidence of her foot impairment and obesity and in accordance with her physicians' reports, the ALJ decided that the plaintiff was slightly limited in her ability to walk and stand and likely unable to lift more than fifty pounds.  (R. at 27).  Since the plaintiff's past relevant job was as a child care worker, which generally required light work, ALJ Katz found that she was able to return to her previous work and was not disabled.  (R. at 27).  The ALJ's determination of the impact of the plaintiff's foot impairment on her ability to

walk and stand was based on substantial evidence and there was
no gap that would require the ALJ to further develop the record.

> C.  <u>Credibility Determination</u>

The ALJ's decision that Ms. Roman's subjective complaints
were not entirely credible was based on substantial evidence and
is entitled to deference.

In determining a residual functional capacity, the ALJ must
take into account "the claimant's reports of pain and other
limitations, but is not required to accept the claimant's
subjective complaints without question; he may exercise
discretion in weighing the credibility of the claimant's
testimony in light of the other evidence in the record." <u>Genier</u>
<u>v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal
citations omitted).

The regulations prescribe a two-step process for weighing a
claimant's allegations of pain and other limitations.  <u>Id.</u>; <u>see</u>
<u>also</u> 20 C.F.R. § 416.929.  At step one, the ALJ must determine
"whether the claimant suffers from a medically determinable
impairment that could reasonably be expected to produce the
symptoms alleged." <u>Genier</u>, 606 F.3d at 49.  Step two requires
the ALJ to consider "the extent to which [the claimant's]
symptoms can reasonably be accepted as consistent with the
objective medical evidence and other evidence." <u>20 C.F.R. §</u>
416.929(a).  Because "symptoms sometimes suggest a greater

severity of impairment than can be shown by objective medical evidence alone," where the claimant's testimony concerning the intensity, persistence, or functional limitations associated with his impairments is not fully supported by clinical evidence, the regulations require the ALJ to consider additional factors to assess the claimant's credibility.[8] 20 C.F.R. § 404.1529(c)(2),(3). The regulations do not allow the ALJ to reject a claimant's statements about her symptoms solely because they are not substantiated by objective medical evidence, but the ALJ may consider any conflicts between the claimant's testimony and the rest of the evidence. 20 C.F.R. § 416.929(c)(2), (4); accord Puente v. Commissioner of Social Security, 130 F. Supp. 3d 881, 894 (S.D.N.Y. 2015).

If an ALJ "finds that a claimant is not credible[,] [he] must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by

---

[8] These include: "(1) the claimant's daily activities; (2) the location, curation, frequency, and intensity of the [symptoms]; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the [symptoms]; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the [symptoms]; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the [symptoms]." Henningsen v. Commissioner of Social Security, 111 F. Supp. 3d 250, 268 (E.D.N.Y. 2015); see also 20 C.F.R. § 416.929 (c)(3)(i)-(vii).

substantial evidence.'" Henningsen, 111 F. Supp. 3d at 268
(quoting Rivera v. Astrue, No. 10 CV 4324, 2012 WL 3614323, at
*14 (E.D.N.Y. Aug. 21, 2012)); see also SSR 96-7p, 61 Fed. Reg.
34483-01, 34485-86, (July 2, 1996) ("The determination . . .
must be sufficiently specific to make clear to the individual
and to any subsequent reviewers the weight the adjudicator gave
to the individual's statements and the reasons for that
weight."). In determining the plaintiff's credibility, the ALJ
is not required to "discuss all the factors [] 'as long as the
decision includes precise reasoning, is supported by evidence in
the case record, and clearly indicates the weight the ALJ gave
to the claimant's statements and the reasoning for that
weight.'" Simmons v. Commissioner of Social Security, 103 F.
Supp. 3d 547, 569 (S.D.N.Y. 2015) (quoting Felix v. Astrue, No.
11 CV 3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012)).

ALJ Katz set out the specific reasons why he found Ms.
Roman's testimony not credible, and his credibility
determination is accordingly entitled to deference. Selian v.
Astrue, 708 F.3d 409, 420 (2d Cir. 2013). Since the
Commissioner has the authority "to resolve evidentiary conflicts
and to appraise the credibility of witnesses, including the
claimant," the only issue is whether the ALJ's finding that the
plaintiff's "assertions concerning her physical limitations were
'not [entirely] credible' is supported by substantial evidence

in the record." <u>Simmons</u>, 103 F. Supp. 3d at 570 (quoting <u>Carroll v. Secretary of Health & Human Services</u>, 705 F.2d 638, 642 (2d Cir. 1983)).

In assessing the plaintiff's characterization of her symptoms, ALJ Katz found "no correlation between the claimant's report of near-total debilitation and the objective clinical finings set forth in the medical evidence". (R. at 25). He considered whether the symptoms Ms. Roman described to her physicians were consistent with what she stated in her testimony and in her application for SSI, noting that she never reported any significant level of debilitation to any of her doctors that would corroborate her claims. (R. at 25). Ms. Roman told Dr. Lathan that she could perform all her daily personal activities, and he observed that she had no issues getting on or off the exam table, showed no signs of acute distress, and was able to change for the examination without assistance. (R. at 351). Furthermore, her primary care physician, Dr. McAllister, did not note any specific physical limitations, but instead recommended that she exercise regularly. (R. at 262, 265, 364, 436). Ms. Roman did tell her physicians that she frequently had seizures, once "blacked out," suffered from back and neck pain, and had a decreased range of motion in her limbs. (R. at 262-63, 265, 453-54). None of these reports, however, described symptoms as

severe as she claimed at the hearing before the ALJ. (R. at 39-
44).

The medical tests that Ms. Roman's physicians performed
provided little objective medical evidence to support her claims
of pain, and no physician indicated the plaintiff had
debilitating impairments. (See, e.g., R. at 352, 383, 428, 457,
463). The x-rays and MRIs only showed that the claimant had, at
most, minimal impairments and that treatment has produced good
results. (R. at 352 (normal musculoskeletal and neurologic
findings); 383 (MRI of plaintiff's spine showing only mild
cervical disk herniation); 435 (reports eighty percent neck pain
relief after steroid injections); 457 (MRI of brain showed no
evidence of hemorrhage or lesion). Her physicians recommended
various forms of pain management, but they were routine and
conservative in nature, and no doctor recommended surgery for
her neck or back or otherwise indicated that more significant
measures were needed. (R. at 46, 268-69, 435). ALJ Katz found
"no correlation between the claimant's report of near-total
debilitation and the objective clinical findings set forth in
the medical evidence." (R. at 25). The medical record supports
the ALJ's decision that while Ms. Roman experienced some
restrictions in her daily living, her activities are not as
limited as she claimed. (See, e.g., R. at 352, 383, 457, 428,
463).

Even though ALJ Katz found that the plaintiff was not entirely credible, he gave the her "the benefit of the doubt based on her history of subjective complaints" of both back and leg issues and recognized "that she is somewhat restricted in walking/standing and might find it difficult to lift/carry objects weighing more than 50 pounds of weight at one time." (R. at 26). The ALJ's determination that the plaintiff is not entirely credible is supported by substantial evidence.

Conclusion

For these reasons, I recommend granting the defendant's motion for judgment on the pleadings (Docket no. 19), and denying the plaintiff's motion (Docket no. 17). Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the chambers of the Honorable Lorna G. Schofield, Room 201, 40 Foley Square, New York, NY 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          August 2, 2016


Copies transmitted this date to:

Howard D. Olinsky, Esq.
Olinsky Law Group
300 S. State St., Suite 420
Syracuse, NY 13202

Susan D. Baird, Esq.
Assistant U.S. Attorney
One St. Andrew's Plaza
New York, NY 10007